# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
---oOo---

UNITED STATES OF AMERICA

v.

JOHN (AKA JOHNNY) G. POLAND
dob 7/19/1968



FILED

JAN 2 2 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

**CRIMINAL COMPLAINT**

Case No.

2 13 - MJ - 1 9    DAD

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about the dates set forth below in Sacramento and El Dorado County, in the Eastern District of California, defendant POLAND, did (Track Statutory Language of Offense)

Count 1, on 6/29/11, violate 18 USC 1512(b)(2)(B) for corruptly persuading a person (C1) to alter, destroy or conceal an object's integrity or availability for use in an official proceeding, and attempting to do so;
Count 2, between 10/18/11 through 11/21/11, violate 18 USC 1512(b)(2)(B) for corruptly persuading a person (C1) to alter, destroy or conceal an object's integrity or availability for use in an official proceeding, and attempting to do so;
Count 3, between 10/18/11 through 11/21/11, violate 18 USC 1512(b)(1) for corruptly persuading another person (C1) with the intent to influence the testimony of any person in an official proceeding, and attempting to do so;
Count 4, between 11/29/11 through 12/20/11, violate 18 USC 1512(b)(2)(B) for corruptly persuading a person (Victim 1) to alter, destroy or conceal an object's integrity or availability for use in an official proceeding, and attempting to do so; and
Count 5, between 11/29/11 through 12/20/11, violate 18 USC 1512(b)(1) for corruptly persuading another person (Victim 1) with the intent to influence the testimony of any person in an official proceeding, and attempting to do so;

each in violation of 18 USC 1512. I further state that I am an FBI Special Agent in and for the Eastern District of California and that this complaint is based on the following facts:

- see attached Affidavit, fully incorporated herein

**X** Continued on the attached sheet and made a part hereof.

Signature of Complainant CHRISTOPHER CAMPION
Special Agent, FBI

Sworn to before me, and subscribed in my presence

_____   at  Sacramento, California
DALE A. DROZD, U.S. Magistrate Judge            Date:

AFFIDAVIT

1.      I, Christopher Campion, am a Special Agent with the Federal Bureau of Investigation (FBI) and I have been so employed since 1989. As such, I am an investigative or law enforcement officer of the United States. I am currently assigned to the South Lake Tahoe Resident Agency, where I conduct a variety of investigations in the areas of violent crime, white collar crime, national security and other federal offenses. As part of my duties I investigate cases involving the corruption of state and local public officials.

2.      As a part of my official duties, I am authorized to investigate and to make arrests for violations of federal and state law, including Title 18, United States Code, Sections 242 (Deprivation of Civil Rights Under Color of Law); 245 (Interference with Federally Protected Activities); 1512 (Witness Tampering), 2232 (Notice of Search Warrant); 2251 Sexual Exploitation of a Minor, and 922(g)(1) Felon in Possession of a Firearm.

3.      This affidavit is made in support of a complaint against South Lake Tahoe Police Department (SLTPD) Officer John (aka Johnny) Gerald G. Poland, for violations of federal criminal law, to wit 18 USC 1512 (Witness Tampering) on 5 occasions (Counts 1,2,3,4 and 5).

4.      The statements in this affidavit are based (a) on my personal knowledge, (b) on my participation in this investigation, (c) on my training and experience and on the training and experience of other law enforcement personnel with whom I have discussed this case, (d) on information gained from other law enforcement personnel, state and federal reports, and data bases, and (e) on statements of witnesses, victims, and law enforcement personnel. Since this affidavit is based on information provided to me by other law enforcement officers, my own investigation of this matter, and from my knowledge, training, and experience, and is being submitted for the limited purpose of securing a complaint and arrest warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested complaint.

5.      In March 2010, law enforcement was conducting surveillance in the South Lake Tahoe area in a gang drug trafficking investigation. Specifically, law enforcement was conducting surveillance of the girlfriend (C1) of Teofilo Garcia Uribe, a validated gang member and drug trafficker. Law enforcement observed the girlfriend, C1, and Uribe together earlier on the same date with Sylvia Liendo (a known drug trafficker and girlfriend of Alex Hurtado, aka "Mousy", who is also a validated gang member). Hurtado was, during this time frame, also being investigated for a plot to murder a SLTPD gang investigator. While doing this surveillance, agents observed Poland, off duty, associating with C1 in a manner that indicated they were familiar. Poland was observed entering, with C1, the South Lake Tahoe residence of C1's daughter (who resided there with a known felon). In 2009, law enforcement had observed Poland, again off duty, in close association with gang members at a funeral.

6.      On June 29, 2010, SLTPD officers served a search warrant for an armed kidnapping suspect named Chris Wadstein. Wadstein was at that time a close associate of C1 and Liendo. Although Wadstein was not located at the initial search location, law enforcement shortly thereafter observed Wadstein arrive and then quickly depart Liendo's residence. A high speed chase ensued. Wadstein was apprehended after crashing his car and attempting to evade officers on foot. Poland, on duty, was assigned to transport Wadstein to jail. Wadstein (having known Poland as a School Resource Officer when he (Wadstein) attended South Tahoe High

Affidavit                                                                                                                                                                        1

School) asked Poland to vouch for his character, to help get rid of "something" for him, and or to make a call to get someone else to get rid of the item. Poland declined and reported the conversation. Law enforcement determined that Poland served as the South Tahoe High School "School Resource Officer" from approximately 2003 through 2006.

7.  In July 2010, law enforcement received uncorroborated information that Poland (while the South Tahoe School Resource Officer) made sexual advances on minor female high school students, failed to arrest high school students for illicit drug possession on school grounds, had a sexual relationship with C1 (a methamphetamine user), disclosed law enforcement informant identities, and identified law enforcement (SLTPD) residence locations. This information was volunteered by 2 criminal defendants facing felony charges and seeking to obtain leniency by cooperating with law enforcement. One of the defendants further stated that Poland provided advance information to C1 so that she will not be caught in illegal activity. Your affiant has relied on this information for lead value, but does not offer the information as probable cause for issuance of the requested complaint and arrest warrant.

8.  Also in July 2010, law enforcement interviewed Uribe, a felon, while he was in custody for a probation violation. Uribe confirmed that his girlfriend, C1, was sexually involved with Poland for two years. He claimed, however, that she is now with Uribe solely. Uribe stated that Poland and C1 were on a common cell phone 'family' plan. Uribe has seen text messages written from Poland to C1, including one on Valentine's Day, 2010, wherein Poland tried to get C1 to meet him in Reno. Uribe stated that Poland planned the trip by lying to his own wife that he had to work. Uribe claimed Poland is associated with Eden, who he also knew as "Tiny." Poland tried to enlist "Tiny" to help set up Uribe by letting Poland know when Uribe possessed illegal drugs. "Tiny" instead alerted Uribe. (Subsequent investigation identified "Tiny" as Eden Solorzano, a validated gang member.) Uribe stated that Poland failed to report to SLTPD that Uribe's then high school aged cousin, the subject of an assault investigation, possessed a "real" firearm on school grounds in 2005. Uribe provided this information voluntarily and without promise of sentencing consideration.

9.  In September 2010, El Dorado County Jail supervisors reported that in September 2010 Poland met, in the county jail, with C1's son and Uribe, both validated gang members, while they were inmates. Jail video tapes corroborated that Poland was at the jail while C1's son was brought out of his cell pod for a visit on September 13, 2010. Poland failed to report this contact as part of his official duties.

10. On September 24, 2010, law enforcement was called to Poland's residence by Poland's wife for domestic violence. She reported that her husband had been having an affair (later determined to be with C1). Poland's wife discovered Poland in the residence garage talking on a secret cell phone. Poland's wife was arrested for striking Poland during the incident. Months earlier, law enforcement learned that Poland's teenaged daughter found a digital memory card in the family residence. Poland's daughter accessed the card and found multiple explicit photographs of her father, Poland, engaged in sexual activity with an unknown female (later identified as C1).

Affidavit                                                                                           2

11. On December 9, 2010, while SLTPD was searching for Hurtado (then a parolee at large), law enforcement received information indicating Hurtado was being transported by C1. During SLTPD briefing (attended by Poland), C1's name, vehicle description, and personalized license plate were announced. Poland failed to report knowing C1, her residence location, or his familiarity with her vehicle to other officers. After the briefing, a SLTPD supervisor observed Poland depart the briefing, go to his patrol car, and make a cell phone call. In a subsequent voluntary interview with C1, C1 recalled that (while Hurtado was being sought) Poland called her from his patrol car. Poland advised her that he had just learned during a briefing that Hurtado was being linked to her vehicle. Poland told her to "get rid of her car".

12. In May 2011, law enforcement executed a state search warrant at a gang member's residence in South Lake Tahoe. After finding a firearm, along with gang indicia, law enforcement uncovered evidence that the firearm was obtained from Uribe. The firearm was determined to be registered to the residence of C1's daughter (at which surveillance officers in 2010 observed C1 and Poland). On June 23, 2011, federal search warrants were issued for the South Lake Tahoe residence of C1 (utilized by Uribe) and the South Lake Tahoe residence of Uribe's mother (also utilized by Uribe). On June 29, 2011, law enforcement planned simultaneous execution of the warrants. During a briefing, Poland was present as a patrol officer assigned to perimeter security for the warrants' execution. During briefing, when photographs and the warrants were circulated, Poland appeared shocked. During the briefing, Poland was observed using his personal "smart" cell phone (with apparent text and internet access capability). Poland initially did not offer any information about C1 or his familiarity with the search location. After another officer (Martinez) was observed whispering to Poland, the officer, Martinez, then offered some intelligence about the interior of C1's residence. Poland then added some information regarding a dog and the possibility of a minor being present at C1's residence. After the briefing, Martinez and Poland advised an SLTPD supervisor that Poland should not be assigned to the perimeter detail. The supervisor warned Poland not to "do anything stupid" to alert anyone to the warrants. The warrants were served later that evening. Four ounces of suspected methamphetamine (NIK tested positive) were located at Uribe's mother's residence. No contraband was located at C1's residence. The suspected methamphetamine was later determined not to be a controlled substance by lab test. Martinez later confirmed that it was he (Martinez) that revealed to SLTPD supervisors that Poland then had a relationship with the subjects of the federal search warrants. Martinez stated that he had to prompt Poland to reveal information during the briefing as to his (Poland's) knowledge of the search locations and, even in doing so, Poland failed to disclose the basis for his (Poland's) knowledge (namely that he had a longstanding romantic relationship with C1).

13. On June 29, 2011, after the briefing and prior to the federal warrants' execution, Poland was alone on routine patrol in South Lake Tahoe. The SLTPD patrol vehicle that Poland used was, by SLTPD consent, outfitted with audio and video recording devices that captured sounds and images inside the patrol car. Poland made telephone calls on his personal cell phone prior to execution of the federal search warrants. In particular, there was one recorded call in which Poland is heard giving detailed notice (location information, target information, agency involvement, and suspected violation information) of the pending execution of the warrants. In the recorded call, Poland admitted that -- during the briefing -- he withheld and failed to reveal to the agencies conducting the searches and federal investigators his sexual relationship with

Affidavit                                                                                                                                      3

C1, his familiarity with C1's criminal activity and associates, and his familiarity with C1's residence (one of the search locations). Poland provided this advance notice to a person familiar with C1. In another call before the warrants' execution, Poland attempted to contact "Tiny", believed to be Eden Solorzano, a known associate of Uribe (the target of the federal warrants). While the searches were on-going, Poland provided sensitive law enforcement information regarding the federal searches to several other individuals, including to C1 via telephone at her work while her residence was being searched. For example, Poland advised C1 that Uribe is the target of the federal investigation, not C1 or her family members. Poland explained that he could not alert her (C1) in advance because "[t]he FBI's involved so I can't fucking say anything, I don't know what they might tap." Poland advised C1 that Uribe was in custody and was being questioned and that the search had located a significant amount of methamphetamine at Uribe's mother's house.

14. On June 29, 2011, Poland -- in anticipation of federal agents interviewing C1 -- instructed C1 on how to respond. For example, Poland (immediately prior to law enforcement contact with C1 at her place of employment) told C1 repeatedly "Well just make sure you hold your shit together" and "If you're contacted when you get off just make sure you're fucking polite and don't be getting short or going off or anything else. If there's anything fucking bad on your phone, go ahead and delete it. They could very well take it." Poland coached her by saying: "Tell them the truth. Unfortunately it looks like my boyfriend got tied up into some shit. I'm not sure of the details. I'm in the dark on it." Poland later acknowledged in the recording that, in fact, both he and she knew Uribe had been "dealing [drugs] all along". Poland warned C1 that law enforcement may have Uribe's phone. Poland advised that law enforcement is interested in phone records, may record phone calls, listen to voice mail, and review text and messages.

15. On June 29, 2011, Poland via phone revealed sensitive law enforcement information to another female, "Niña" (who law enforcement later identified as Cynthia C, then age 23). Poland then had an on-going sexual relationship with "Nina". Poland met "Niña" while she was a high school student and he was the School Resource Officer. During the recording, among other things, Poland revealed to "Niña" the federal nature of the investigation, including that it involved FBI SWAT personnel. In this recording, Poland also admitted that he withheld information (during the briefing) from law enforcement about his involvement with C1. Cynthia C later confirmed that she had a romantic relationship with Poland and that Poland had a prior relationship with C1. Cynthia C also confirmed that Poland told her about the federal search warrants and that she (Cynthia C) was familiar with C1 and Uribe. Cynthia C denied that she alerted C1 and or Uribe of the search warrants as a result of Poland's disclosure. Cynthia C confirmed that Poland provided her a printout of internal police documents (her own SLTPD "police file"). Law enforcement determined that when Poland obtained these internal police documents for Cynthia C, he also caused her name to be run in NCIC (Nation Crime Information Computer) and CLETS (California Law Enforcement Telecommunications System).

16. On June 29, 2011, during a voluntary interview with federal law enforcement, C1 was asked to identify everyone she had discussed the search of her residence with that day. C1 did not disclose talking to Poland. C1 admitted deleting messages from her phone that day,

Affidavit                                                                                            4

including messages from the subject of the search warrants (Uribe), a friend (Liendo), and her children. She claimed (as Poland had coached) that she did not know Uribe was involved in drug trafficking or that he currently used drugs. During a subsequent voluntary interview (on October 18, 2011), C1 stated that, in anticipation of her June 29, 2011 interview, she deleted text messages from her phone pursuant to Poland's instructions. On October 18, 2011, C1 stated that, sometime after the June 29, 2011 interview, Poland told her that the FBI had interviewed him the next day (June 30, 2011) and the FBI might be coming back to interview her.

17. On June 30, 2011, Poland provided a voluntary interview to law enforcement. Poland admitted having a romantic relationship with C1 but lied about its length and when it terminated. Poland knew C1 was involved with Uribe, suspecting they were both seeing her at the same time. Poland knew Uribe was a parolee, drug dealer, and gang member. Poland offered to ask his friend "Tiny" (who he purported to be a reformed gang member) about Uribe possessing firearms. Poland knew C1's son was a gang member and was on parole for robbery. Poland claimed C1's son was a "good kid" who got involved with bad people. Poland admitted visiting C1's son in jail while on duty to check on him "because he's her (C1's) son." Poland admitted that C1 attempted to contact him the previous day (after learning of the search of her residence through her manager). He ignored her contacts until after the warrants had been executed. He admitted talking to her several times by phone at her employment. Poland stated that he makes calls on his "smart" phone both directly and through the "Google Talk" application. Poland claimed that by using "Google Talk" his call records do not show individual call details. Poland refused to provide his Google account user name.

18. During the October 18, 2011, interview, C1 stated that Poland gave her sensitive law enforcement information on other occasions. C1 stated that Poland often told her to stay away from particular people, at times telling her "Just listen to me. I know what I'm talking about." C1 stated that Poland gave her advance information about Wadstein being wanted and for her to avoid him. C1 stated that Poland gave her advance information about "Mousy" (Hurtado) and advised her to avoid him and to get rid of her car. C1 denied giving "Mousy" rides and told Poland she might go to the police station to tell them she was not doing so. Poland responded "Are you that stupid? So they can ask you who told you this?"

19. Also during the October 18, 2011 interview, C1 stated that she asked Poland to "run" people at various times during their relationship. C1 stated Poland provided vehicle registration information to her and her associates. C1 also stated that, at her request, Poland ran a check on whether a known local drug trafficker had an active warrant. C1 made the request on behalf of her associate, Liendo. Poland agreed to run the check, and later informed her that she (C1) should stay away from the drug trafficker (subject of the search) because she was wanted by the police. Also, Poland checked whether C1 had an active traffic warrant. Law enforcement data base record checks confirm Poland ran and or caused to be run all 3 protected non-public law enforcement computer record checks. C1 reported Poland often visited her at her residence while he was on duty and she recalled two incidents when she and Poland had sex while he was on duty.

Affidavit                                                                                                                          5

20. On October 18, 2011, C1 stated that Poland told her that he had engaged sexual activity with a 17 year old South Tahoe High School student (Victim 2).[1] Poland stated that the sexual relationship with Victim 2 occurred while he served as the School Resource Officer. C1 herself was not involved with Poland when he was in the sexual relationship with Victim 2. However, C1 was then acquainted with Poland and Victim 2. C1 stated that during the relevant period she had observed both Poland's personal car and his police car at Victim 2's house severaltimes. Poland told C1 that he went to Victim 2's house drunk, and she (Victim 2) called Poland's wife, who then called police. C1 later recalled Poland stating he was very close to "going all the way" with the minor female, but stopped due to her age. C1 later learned that Poland gave Victim 2 gifts including a cell phone, CDs, and money.

21. On October 18, 2011, C1 stated that Poland similarly seduced her (C1) with similar gifts. C1 provided personal items corroborating her relationship with Poland including CDs, photographs of the two of them, videos of Poland (including a video of him masturbating), hotel receipts and keys, romantic greeting cards, tickets and programs of events they attended, and gifts such as perfume, chocolates, a ring and a necklace. She also turned over an actual SLTPD badge assigned to Poland and Poland's military "dog" tags, both of which Poland had given to her. C1 provided these items for evidence after service of a grand jury subpoena.

22. On October 18, 2011, between service of the subpoena and C1's compliance with the production of the items, Poland met with C1 in a consensually recorded conversation while Poland was on duty. After viewing the subpoena, Poland stated that the FBI was investigating him for being a "dirty cop" stemming from the Uribe gun investigation. Poland informed her that federal authorities want to know whether "I [Poland] tipped you [C1] off" or someone else to protect you. Poland stated that she did not have to talk to the FBI. Poland stated "it's going to be up to you what things you kept, what things you didn't, text messages, voice mails, whatever." Poland cautioned her (C1) that they may be under surveillance. Poland indicated that he had been engaged in counter surveillance, watching for anyone following her, prior to stopping her. Poland stated that he was going to immediately "clean out" his police locker of any evidence of a relationship between himself and C1 because the investigators "don't need to see pictures of you and I. They can kiss my ass. I better not keep anything at work." Poland advised her (C1) to conceal or destroy the items sought by the grand jury subpoena. In an effort to persuade her, Poland suggested to her (C1) that it would be logical for someone who had ended a relationship to get rid of items such as those compelled in the subpoena. C1 told him (Poland) in the recorded conversation that she still had many mementos of their relationship. Poland indicated to her that she can not provide objects that she does not possess. C1 understood this to mean Poland was instructing her to destroy items covered by the subpoena. Poland stated "I'm not sure I'll beat this one." Then, after claiming "I know I didn't do anything

---

[1] In a subsequent interview, C1 recalled another minor female (Victim 1) with whom Poland admitted having sexual activity. C1 believed Victim 1 is now a 25-26 year old South Lake Tahoe resident who had recently relocated back to the Tahoe area from Southern California. Poland told C1 that he had sex with Victim 1 at the time she was babysitting his children. As with Victim 2, Poland's sexually relationship with Victim 1 occurred prior to C1's relationship (starting 2007) with Poland.

Affidavit                                                                                       6

wrong", Poland acknowledged "but a lot of shit's thrown at me." Poland then coached C1 stating "They're going to ask: Did you talk to Johnny?, What did he say?" After having previously instructed C1 to conceal or destroy evidence, he told her to say his advice to her was "Just be honest and tell the truth."

23.   On October 19, 2011, Poland called C1 at work. Poland told her he had researched grand jury subpoenas and explained to her that she had to show up as directed, but she is entitled to legal representation, although the attorney would not be in the room with her. Poland, in an effort to persuade her, added that she should be careful with what she said because it could be used against her, and that she did not have to talk to anyone. Poland pressured her by saying that he was scared because "the minute you testify, they'll come to arrest me." Poland said there would probably be an internal affairs investigation too. Poland, in a further effort to persuade her to destroy evidence compelled for production by the subpoena, advised her again that the subpoena was "asking for anything that has to do with me and shit if you don't have it, you just don't have it."

24.   On October 21, 2011, C1 received a telephone call from Poland. The call was recorded. Poland told her (C1) that she may be asked for her phone records, which she could deny having. Poland stated that the FBI would go back to 2007 (when he started seeing C1) to uncover "shady shit." Poland said the FBI might try to tie him to Uribe's gun and that she should be honest that he had nothing to do with that. Poland, again attempted to persuade her to destroy subpoenaed items by stating that she can't give up what she does not have. On October 24, 2011, Poland sent a text message to C1 urging her to just tell the truth, that they are after him and not her, and if they talk or meet, they (the FBI) will "imply I'm coaching or coercing you."

25.   On October 31, 2011, Poland met with C1. In a recorded conversation, Poland stated that the FBI thinks he was "ratting, giving everyone the heads up about everything." C1 said the FBI was asking questions about Liendo, "Mousy" (Hurtado), and Wadstein, as well as items called for by the subpoena. Poland advised her that it was a common law enforcement tactic. C1 said that she still had all the items listed in the subpoena. Poland again responded that "you can't take what you don't have." He went on to tell her that he got rid of everything relating to her, except for three emails and pictures. When asked about the instances when he tipped C1 off about law enforcement interest in her friends and associates, Poland coached her that the "proper response" would be that "He (Poland) tried to do anything to keep me (C1) out of harm's way. To keep away from certain people." He said she should be honest. Poland claimed he did not recall providing sensitive law enforcement information to C1 for Liendo, but observed that it all goes down to being "a snitch and a rat, protecting these people." When C1 reminded Poland that he had "run names" for her and that the FBI may be able to show that through records, he (Poland) responded that they (the FBI) did not know anything. Poland coached C1 regarding her terminology, stating "Be very careful.. Did I run somebody or check on a case?" Poland then framed the federal investigation, saying "that's what they [the FBI] are after, tie me into all this, I'm an informant for you", and then he attempted to influence her testimony by adding "I gotta worry about my life in your hands. A lot hinges on what you say." C1 believed that Poland was attempting to influence her grand jury testimony and that he was urging her to destroy evidence compelled by her grand jury subpoena.

Affidavit                                                                                                                      7

26. On November 3, 2011, Poland conversed with C1 via telephone. The conversation was recorded. Poland stated that he had attempted to find Wadstein to talk with him about the investigation and to determine whether Wadstein was cooperating with law enforcement. Poland demanded that C1 conceal objects from the federal grand jury stating, among other things, "don't be fucking giving them my badge and my dog tags." Poland further demanded that she "better give that shit to me before you go giving those to them." Poland instructed her on how to ensure deletion of electronic data on a computer or smart phone. Poland stated that he researched, including on Google, how permanently to delete data. Poland explained that even after you delete the "stuff" (pictures, emails, texts, voicemails), you have to go the the "garbage" and delete it again. Poland stated that he could only delete 10 items at a time. Poland stated that he "got rid of all of them" and added that he only kept 3 emails from C1. Poland also further coached C1 on what he wanted her to say to the federal grand jury. Poland told her to tell the grand jury that law enforcement is "out to get Johnny [referring to himself]" and that the investigation is "bull shit". Poland admitted that he knew his relationship with C1 and her associates was going to harm him.

27. On November 16, 2011, C1 advised law enforcement that on approximately November 12, 2011, Poland had talked to C1's son-in-law. Poland told him that C1 was scheduled to testify about him (Poland) and that her testimony could be very detrimental to him. On November 14, 2011, Poland told C1's daughter that he could no longer talk with her. On November 21, 2011, Poland (as visually depicted in work place video) told C1's son to tell his mother to make the right choice. C1 stated that Poland made these contacts to pressure her, influence her testimony, and discourage her cooperation with this investigation.

28. On November 29, 2011, federal law enforcement contacted Victim 1. After this initial contact (wherein she denied a sexual relationship with Poland), Victim 1 contacted Poland. According to Victim 1 (in late December 2011 interview), Poland at first admonished her that she didn't have to talk to the FBI. Poland later instructed Victim 1 "not to say anything." Two days later, after being served with a grand jury subpoena to testify, Poland told her to tell the truth in grand jury, but he repeated that she did not have to talk to the FBI. Poland warned her she may be asked about their sexual relationship while she was in high school. After discussing the timing of their sexual history, Poland stated they had nothing to hide. Poland told Victim 1 that the federal investigation had to do with C1, whom Victim 1 had heard of but had never met. Poland referred to C1 as "Psycho" and attempted to persuade Victim1 to tell the Grand Jury that C1 was crazy. Poland told Victim 1 that C1 could negatively impact his family life and job. Poland asked Victim 1 to bring a letter to the Grand Jury that he would prepare. Poland suggested she get an attorney to represent her.

29. On December 15, 2011, law enforcement conducted a voluntary recorded interview with Victim 1 in connection with her appearance before a federal grand jury. After several prior denials to law enforcement, Victim 1 disclosed that she engaged in sexual activity with Poland in October 2003 while she was a 17 year old senior in high school. Poland was at the time a 35 year old School Resource Officer at South Tahoe High School. Victim 1 went to Poland's office at the high school for advice after a personal tragedy. Poland had previously assisted her when her property was vandalized at the high school. At the beginning of her senior

year, she and Poland became close and met several times at out of the way locations where they would kiss and fondle each other. Victim 1 stated that on at least one occasion while she was 17 years old, Poland digitally penetrated her vagina. Poland asked her several times to perform oral sex on him, but she declined. Their meetings took place in secluded spots Poland suggested. Their meetings occurred both while he was on duty and off, including occasions when he took her home from babysitting his children. She and Poland also engaged in sexual activity at Poland's house while his wife was at work. Poland took her through Nevada to the North Shore of Lake Tahoe and to Sacramento. Victim 1 stated she did not have sexual intercourse with Poland until after her 18th birthday and her graduation from high school. In the late summer and early fall of 2004, Victim 1 and Poland met for sexual intercourse on two or three occasions at a motel in South Lake Tahoe. During her senior year in high school, Poland gave her several gifts, including music CDs and Dallas Cowboys shorts and halter top, which he had shipped to the high school so that his wife would not know about them. Poland acknowledged his sexual relationship with Victim 1 by signing Victim 1's high school yearbook with a hand written entry including "I will always hope the best for you and will always be here for anything you might need IE ... A shoulder to cry on, a Hug, Kiss... (Take Forgranted [sic] Terre [Poland's wife] isn't around). I do appreciate your individual time that you give me and look forward to the days (and nights) ahead!"... "You are a special person to me [Victim 1's first name]! I love you (Shhh!) [heart symbol] JP  P.S. I don't think you suck in bed!"

   30. On December 20, 2011, Victim 1 spoke with Poland in a consensually recorded telephone conversation. He expressed hesitation about talking to her because it would look bad. Poland attempted to persuade her to tell law enforcement that the police were out to get him. Poland stated that SLTPD was retaliating against him. Poland stated that C1 was a "crazy bitch." During the conversation, Victim 1 informed Poland that she had appeared before the grand jury and that law enforcement seemed to know everything about their relationship, including their meetings at a particular motel in South Lake Tahoe. Poland told her to tell the truth saying that she had not done anything wrong. Instead of acknowledging his sexual activity began when Victim 1 was 17 years old and in high school, Poland attempted to influence her by characterizing his illicit sexual contact with her as merely an affair: "Oh well, so you and I had an affair, fucking lock me up." When Victim 1 told Poland she received a subpoena to produce emails and whatever gifts Poland had given her, Poland attempted to persuade her to destroy evidence by repeatedly telling her "You can't take what you don't have." He also told her to be honest because she's not in trouble.

   31. On February 2, 2012, Victim 2 was interviewed. She disclosed for the first time that she had engaged in sexual activity with Poland while she was a high school student and he was the School Resource Officer. They met her freshman year and became closer during her junior year when she returned to Tahoe after having moved away. Poland regularly gave her rides to and from school in his police patrol car. He would also get her, and her friends, out of trouble at school. He provided her and her friends with alcohol. Poland gave her a cell phone for Christmas her senior year. Poland regularly visited the house Victim 2 shared with her younger sister during Victim 2's senior year. At the time, Victim 2 and her sister lived alone. Victim 2's father was then on probation and her mother was wanted on criminal charges. Victim 2's parents did not financially support their daughters requiring them to support themselves. Victim 2 reported that Poland initially kissed and fondled her on several occasions. Poland's

Affidavit   9

sexual conduct then progressed to digitally penetrating her vagina on several occasions. On one of the occasions in which Poland digitally penetrated her vagina, Victim 2 specifically recalled Poland was visiting her house while on duty and in uniform. Their escalating sexual activity was interrupted when Poland received a work call and had to leave. Victim 2 stated that all of her sexual activity with Poland occurred when she was 17 years old.

      32. In January 2006, as documented in police reports, Poland unexpected arrived at Victim 2's house. At the time, Poland was off duty and intoxicated. Victim 2 specifically remembered this incident. Victim 2 was 17 years old. She recalled that Poland came to her house intoxicated and at times staggered and walked into a door frame. Victim 2 stated that Poland tried to get her to a back bedroom because he wanted to engage in sexual activity. Poland put his arm around her and tried to direct her into a back bedroom. When she refused and told him to leave the house, Poland refused to leave. In an attempt to force him to leave, Victim 2 called Poland's wife and then the police department. After Poland realized that Victim 2 had contacted his wife, Poland retaliated. Poland threatened to contact the probation officer of Victim 2's father. Poland threatened to contact Victim 2's boyfriend. Poland also threatened to turn Victim 2's mother, who Poland knew was wanted, in to law enforcement. This incident, and the subsequent police internal affairs investigation, ended their sexual relationship. Poland maintained contact with Victim 2, including signing off on subsequent 'fix-it' tickets that she had not complied with. She also stated that he conducted law enforcement computer checks for her.

      33. From April through June 2012, law enforcement identified additional former South Tahoe High School students as being unusually close to Poland while he was the School Resource Officer and they were high school students. Two of the women described Poland taking a special interest in them. Each stated Poland gave them nicknames, gifts, and other special attention. Based on my training and experience, I am aware that pedophiles often seduce or "groom" minor victims with such techniques. Both former students, separately, acknowledged that Poland appeared to be interested in having a sexual relationship with them. Both denied that any sexual activity occurred. Each of the former students separately reported that Poland told her that he had a sexual relationship with another high school girl. One of the former students said that Poland confessed to her that he had sex with Victim 1 when she was in high school. The other former student said Poland, in confessing his prior sexual relationship with a high school girl, did not identify with whom he was having sex. She, however, was aware that he was closely involved with Victim 2 when she and Victim 2 were in high school. Based on my training and experience, I am aware that pedophiles often further seduce or "groom" minor victims with such admissions to validate his desired sexual activity and encourage a sexual relationship.

      34. Based on the above information, there is probable cause to believe that John (aka Johnny) G. Poland has committed 5 violations, as follows:

- Count 1, on 6/29/11, a violation of 18 USC 1512(b)(2)(B) for corruptly persuading a person (C1) to alter, destroy or conceal an object's integrity or availability for use in an official proceeding, and attempting to do so;

Affidavit                                                                                                                                               10

- Count 2, between 10/18/11 through 11/21/11, a violation of 18 USC 1512(b)(2)(B) for corruptly persuading a person (C1) to alter, destroy or conceal an object's integrity or availability for use in an official proceeding, and attempting to do so;

- Count 3, between 10/18/11 through 11/21/11, a violation of 18 USC 1512(b)(1) for corruptly persuading another person (C1) with the intent to influence the testimony of any person in an official proceeding, and attempting to do so;

- Count 4, between 11/29/11 through 12/20/11, a violation of 18 USC 1512(b)(2)(B) for corruptly persuading a person (Victim 1) to alter, destroy or conceal an object's integrity or availability for use in an official proceeding, and attempting to do so; and

- Count 5, between 11/29/11 through 12/20/11, a violation of 18 USC 1512(b)(1) for corruptly persuading another person (Victim 1) with the intent to influence the testimony of any person in an official proceeding, and attempting to do so;

Accordingly, based upon the foregoing, your affiant has probable cause to believe that Poland has committed the above referenced felony violations and requests that this Court issue a complaint and arrest warrant against Poland.

35. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief, and that this affidavit was executed in Sacramento, California on January 17, 2013.

CHRISTOPHER CAMPION
Special Agent, Federal Bureau of Investigation

Sworn and subscribed before me
this 17th day of January, 2013

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE
Eastern District of California

Approved

Michelle Rodriguez  1/17/2013
Assistant United States Attorney
Eastern District of California
///

Affidavit                                                                                                        11